**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
Eastern Division

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 18-cv-12462** |
| | ) | |
| **HARVARD UNIVERSITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF JOHN DOE'S MOTION FOR**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Pursuant to Rule 65(a), (b) of the Federal Rules of Civil Procedure, Plaintiff John Doe

("Plaintiff") respectfully submits the following memorandum of law in support of his motion for

a temporary restraining order and a preliminary injunction against Defendant Harvard University

("Harvard" or "the University").

Mr. Doe is a student at the Faculty of Arts and Sciences ("FAS"), a college within

Harvard University.  Mr. Doe has been accused of sexual assault by a young woman, Jane Roe.

Ms. Roe does not attend the University; her allegations are all based on events that occurred

more than sixteen months ago and hundreds of miles away from Harvard's campus; those events

did not occur during the academic year or in connection with any Harvard program; and none of

the witnesses involved are Harvard students or otherwise connected with Harvard.  In short, the

incident has nothing to do with Harvard.

Also, Ms. Roe, the complainant in Harvard's proposed proceedings, has filed a separate

civil lawsuit against Mr. Doe in another jurisdiction (after the relevant law enforcement

authorities, following an investigation, declined prosecution); Ms. Roe's civil lawsuit remains

ongoing, and it appears that Ms. Roe seeks to gain leverage in that lawsuit, or otherwise to harass Mr. Doe, by pressing Harvard to undertake proceedings against Mr. Doe.  Harvard, for its part, appears all too happy to be enlisted in this way.

Mr. Doe is asking the Court to enjoin Harvard from pursuing, through FAS, disciplinary proceedings against him, because FAS doing so would constitute both (1) a breach of the contract between Harvard and Mr. Doe, and (2) a breach of the covenant of good faith and fair dealing implicit in that contract.

## I.      INTRODUCTION

This case is about a promise that Harvard has made to its students (and other community members) about when it reasonably may subject them to its campus discipline process in connection with allegations of sexual misconduct, and when it may not.  Harvard's relevant policy is its "Sexual and Gender-Based Harassment Policy" (the "Policy").  Exhibit 1.  That policy expressly defines the "sexual harassment" regulated by the policy to include "sexual assault."  *See id.* at 2 ("Sexual violence, including rape, sexual assault, and domestic and dating violence, is a form of sexual harassment.").  Harvard's policy then makes plain, in a section entitled "**Jurisdiction**" (emphasis in original), that it—the university policy regarding sexual assault—applies to all Harvard "students, faculty, [and] staff," among others, but only "whenever the misconduct occurs":

(1)      On Harvard property; or

(2)      Off Harvard property, *if*:

a.      the conduct was in connection with a University or University-recognized program or activity; or

b.      the conduct may have the effect of creating a hostile environment for a member of the University community.

*Id.* at 3 (emphasis added).

One Harvard school, FAS, is flouting those limitations.  It has its own policies and procedures ("FAS Policy and Procedures"), which, while in one breath pledging adherence to the University's Policy, simultaneously proclaim that FAS will investigate students accused of sexual misconduct any time FAS sees fit, regardless of what Harvard's Policy says.  Exhibit 2 at 7.

And FAS now in fact is going as far as it conceivably could go beyond the jurisdictional limits of Harvard's Policy.  It is investigating a Harvard student who has been accused of sexual misconduct—Mr. John Doe—and the connection to Harvard ends there.  Mr. Doe's accuser is not a Harvard student.  Compl. ¶ 17.  Indeed, to Mr. Doe's knowledge, no one at Harvard ever has accused him of sexual assault, and he has no disciplinary record whatsoever at Harvard.  Compl. ¶ 31; Exhibit 3 (John Doe Statement (redacted)) at 5.  Harvard's Title IX investigator openly has admitted—twice—that Harvard does not believe that Mr. Doe has created any hostile environment for anyone at Harvard.  *See* Exhibit 4 (Email from Ilissa Povich to Mr. Doe's counsel (Nov. 2, 2018); Exhibit 5 (Email from Ms. Povich to Mr. Doe) (Nov. 8, 2018)).  Rather, Ms. Roe's allegations center on an encounter that did not take place on or near Harvard property; indeed, it took place hundreds of miles away from Harvard's campus.  Compl. ¶¶ 2, 15.  It did not take place during the academic year or in connection with any Harvard program or activity, or while Mr. Doe was participating in any such program or activity.  *Id.* ¶ 23.  There are no Harvard witnesses.  *Id.*  Indeed, the incident took place more than sixteen months ago, and, more than eight months ago, Ms. Roe filed a civil suit against Mr. Doe (again, in a jurisdiction hundreds of miles away) in connection with the incident, which lawsuit Mr. Doe is in the process of defending.  *Id.* ¶ 4.  In short, the only connection to Harvard with any of this is that the

accused young man, Mr. Doe, happens to be a Harvard student (and his school happens to be, for whatever reason, all too happy to have itself enlisted in support of his accuser's efforts to harm him).

Students who attend Harvard have a reasonable expectation of when and under what circumstances they may be subject to Harvard disciplinary proceedings.  Those expectations flow, at least in considerable part, from the University's express policies, which policies bar the university and its component entities from doing what FAS is attempting to do here.  And Massachusetts law does not permit Harvard, through one of its schools (here, FAS), to flout its promise to subject its students to the university's discipline process only in enumerated, reasonable circumstances.

Harvard—through FAS—is forcing Mr. Doe to make an impossible choice:  He is being forced to choose between (1) participating in the campus proceeding and abandoning the procedural protections he has in the civil case—with subpoena power, expansive access to discovery, including testimony from Ms. Roe and other witnesses who will be under oath, and the right to cross-examine Ms. Roe and those witnesses; or (2) risking suspension or even expulsion from Harvard if he does not defend himself in the campus case.  An immediate injunction is necessary so Mr. Doe does not have to make that impossible and fundamentally unjust choice.

## II.     BACKGROUND

### A.     John Doe.

Mr. Doe is a student at Harvard University.  Compl. ¶ 14.  He spent the summer of 2017 completing an internship.  *Id.* ¶ 15.  Ms. Roe attended a different university; she likewise spent the summer of 2017 completing an internship.  *Id.* ¶¶ 16-17.

On the night of July 22, 2017, Mr. Doe met Ms. Roe at a party.  Compl. ¶ 18.  At some point in the early morning hours of July 23, 2017, the two engaged in sexual activity.  *Id.*

Ms. Roe now claims that she did not consent to this activity, and therefore that Mr. Doe sexually assaulted her.  Compl. ¶ 18.  To be blunt, she now claims that he raped her.  *Id.*  (These allegations are categorically false.)  *Id.*  Ms. Roe first filed a complaint with the local police department, but, following an investigation, law enforcement declined to prosecute.  *Id.* ¶ 19.  Ms. Roe then filed a civil personal injury lawsuit against Mr. Doe in March 2017, which lawsuit remains pending.  Compl. ¶ 20.

About seven months later, on or about October 17, 2018, Mr. Doe was summoned to a meeting with the Harvard University Office for Sexual and Gender-Based Dispute Resolution ("ODR"), which is an office tasked by FAS with investigating claims of sexual misconduct.  *Compl.* ¶ 22; Exhibit 2 at 7.  In that meeting, Mr. Doe learned for the first time that ODR was planning to investigate whether he had sexually assaulted Ms. Roe.[1]  When Mr. Doe, through his advisor, asked Harvard's Title IX investigator why the University believed it had jurisdiction to pursue this matter, the investigator directed Mr. Doe and his advisor only to Section III of the FAS Policies and Procedures, which is discussed below.  *See* Exhibit 2 at 7.

### B.    Harvard's Policies and Procedures.

#### 1.    The Harvard University Sexual and Gender-Based Harassment Policy.

---

[1] It is unclear, based on the record that Harvard has made available to Mr. Doe, whether Ms. Roe or her attorney in the civil case, or some other source, initially brought Ms. Roe's allegations to the Title IX office at Harvard.  Mr. Doe has asked, and Harvard has refused to answer—stating only that the official "Reporter" of the offense was the Harvard Title IX Coordinator, and declining to reveal how that official became aware of the allegation.  *See* Ex. 5.

Harvard University has adopted a Sexual and Gender-Based Harassment Policy.  Exhibit 1.  The language in the Policy makes clear that it is meant to apply to all members of the University community.  *See id.* at 1 ("Harvard University is committed to maintaining a safe and healthy educational and work environment in which no member of the University community is, on the basis of sex, sexual orientation, or gender identity, excluded from participation in, denied the benefits of, or subjected to discrimination in any University program or activity.").

As noted above, that Policy also makes clear in what circumstances Harvard does, and does not, have jurisdiction to investigate sexual assault claims.  Ex. 1 at 3.  More particularly, Harvard limits its purported "**Jurisdiction**" with respect to the Policy to alleged conduct that occurs (1) "[o]n Harvard property," or (2) "[o]ff Harvard property, *if*" one of two further conditions are satisfied.  *Id.* (emphases to "Jurisdiction" in original; emphasis to "if" added).  Those conditions, which are critical, given that there is no dispute that Mr. Doe's alleged conduct did not occur on Harvard property, are:  "(a) the conduct was in connection with a University or University-recognized program or activity;" or "(b) the conduct may have the effect of creating a hostile environment for a member of the University community."  *Id.*  Again, however, there is no dispute that Ms. Roe's allegations do not satisfy either condition:  Mr. Doe's alleged conduct bore no connection whatsoever to any Harvard-recognized program or activity, and, as Harvard correctly has conceded, Mr. Doe's alleged conduct also was not such (because it had nothing to do with Harvard), as to create a hostile environment for any member of the Harvard community.

### 2.    FAS Policies and Procedures.

FAS has promulgated a document entitled *FAS Sexual and Gender-Based Harassment Policies and Procedures*.  Exhibit 2.  Harvard University's website indicates that this document is part of the "Procedures" the different schools at Harvard implement underneath the umbrella

of the Policy.  *See* Exhibit 6 (screenshot of Harvard's Title IX website at "Procedures," available

at https://titleix.harvard.edu/procedures) (last visited Nov. 28, 2018).  And the FAS Policies and

Procedures state that the University Policy applies to all Harvard Schools and units, including

FAS, and to all Harvard students, faculty, staff, appointees, and third parties.  Exhibit 2 at 2.  But

the FAS Policies and Procedures go further, claiming for FAS not only the authority to

"elaborat[e] on and supplement[]" the University Policy, but also the authority to ignore the

jurisdictional limitations imposed by that policy (notwithstanding FAS's previous commitment,

in almost the same breadth, to "adhere[] to" the University Policy):

> The Faculty of Arts and Sciences, including the College and the
> Graduate School of Arts and Sciences, shares an additional
> commitment to training our students to be citizens and citizen
> leaders within a larger community beyond the borders of our
> campus.  For this reason, it is the expectation of the Faculty of Arts
> and Sciences that all students, whether or not they are on campus or
> are currently enrolled in a degree program, will behave in a mature
> and responsible manner.  *Consistent with this principle, sexual and
> gender-based misconduct are not tolerated by FAS even when,
> because they do not have the effect of creating a hostile environment
> for a member of the University community, they fall outside the
> jurisdiction of the University Policy.*  Because sexual and gender-
> based misconduct are in direct opposition to our community values,
> cases involving such conduct may be referred by the relevant
> Administrative Board ("Ad Board") to the Harvard University
> Office for Sexual and Gender-Based Dispute Resolution ("ODR")
> for investigation in accordance with the University Procedures and
> the jurisdictional guidelines described in this Policy.

Section III (emphasis added) (Exhibit 2 at 3).

The FAS Policies and Procedures therefore make clear that FAS is in one breath claiming

fealty to the Policy, while in the next breath asserting the authority to subject its students to

disciplinary proceedings regarding accusations of sexual misconduct over which it has no

jurisdiction under the Policy.  *See id.*  To the best of Mr. Doe's knowledge, there are no other

schools at Harvard that have adopted this expansive view of jurisdiction (Harvard certainly has

yet to identify any[2]), and in fact a number expressly reject any such interpretation.  *See* Exhibits 7-9.

### C.     Mr. Doe Submits to ODR That It Does Not Have Jurisdiction, but ODR Continues Its Proceedings.

On November 7, 2018, Mr. Doe submitted a detailed statement to Harvard University, in which he pointed out that FAS does not have jurisdiction to subject him to disciplinary proceedings with respect to this matter.  Exhibit 3.  Alternatively, Mr. Doe further explained that, even if FAS did have such jurisdiction, it would not be appropriate to exercise it here, including because the incident has no connection to Harvard and because Harvard necessarily will not afford him a fair or thorough investigation.  *Id.* at 4-5.  Finally, Mr. Doe asked ODR at least to stay its disciplinary proceeding until the pending civil litigation could be resolved, given the serious impact it could have on his ability to defend himself in the civil case.  *Id.* at 5-6.

---

[2] Harvard's Title IX investigator has asserted that "[s]everal schools have codes of conduct that are broader than the University policy and are in addition to the University policy."  Ex. 5.  That investigator, however, has not identified any such schools (and nor has anyone else at Harvard done so).  And certainly no one has identified a school that asserts jurisdiction beyond what the University Policy allows.  Indeed, none of the other procedures available on Harvard's website governing allegations of student misconduct (for any of Harvard's various schools) asserts the authority to investigate allegations that go beyond the Policy's jurisdictional limits.  *See* Exhibit 7 (Harvard Graduate School of Design, *GSD Local Policies*, http://www.gsd.harvard.edu/resources/personal-conduct/#titleix); Exhibit 8 (*Harvard University Procedures for Handling Complaints Against Students Pursuant to the Sexual and Gender-Based Harassment Policy*, http://titleix.harvard.edu/files/title-ix/files/harvard_student_sexual_harassment_procedures.pdf (adopted by other Harvard schools, including Harvard Business School, Harvard Kennedy School, and Harvard Divinity School)); Exhibit 9 (Harvard Law School, *HLS Sexual Harassment Resources and Procedures for Students*, http://hls.harvard.edu/content/uploads/2015/07/HLSTitleIXProcedures150629.pdf).  In fact, GSD's policies explicitly state:  "None of the provisions outlined here contradict or replace any provisions of the University Procedures . . .  To the extent any existing GSD policies and procedures interfere with compliance with the University Policy and Procedures, *application of such GSD policies and procedures should be suspended*.") (emphasis added) Exhibit 7 at 15.

The Title IX investigator responded, fewer than 24 hours later, rejecting all of these arguments. She wrote, in part, that FAS "ha[s] the authority to adopt [its] own policies regarding student conduct." Exhibit 5. She cited no authority for that assertion (and nor has Harvard subsequently provided any). *Id.* Rather, the Title IX investigator announced that the investigation would proceed. *Id.*

Only when, on November 15, 2018, the Department of Education issued its new, proposed rules for student disciplinary proceedings in alleged sexual assault cases (rules with which Harvard's current proceedings do not comply), did Harvard agree temporarily to pause its proceedings. Compl. ¶ 33. On November 27, however, Harvard's Title IX investigator announced that Harvard would continue its disciplinary proceedings against Mr. Doe (with no changes to its existing procedures), pressing him to appear for an interview the very next day (November 28) or, alternatively, later in the same week. *Id.*; Exhibit 11.

## III.   LEGAL STANDARD

The same standard governs the grant of a preliminary injunction and a temporary restraining order. *Levesque v. State of Me.*, 587 F.2d 78, 81 (1st Cir. 1978). In deciding whether to grant either form of injunctive relief, the Court must consider: (1) the movant's likelihood of success on the merits, (2) whether the movant is likely to suffer irreparable harm in the absence of preliminary relief, (3) whether the balance of hardships weighs in favor of the movant, and (4) whether an injunction is in the public interest. *See Voice of The Arab World, Inc. v. MDTV Medical News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011). Although all four factors matter in this analysis, the moving party's likelihood of success on the merits is "the touchstone of the preliminary injunction inquiry." *Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 674 (1st Cir. 1998).

## IV.    ARGUMENT

The Court should issue a temporary restraining order, followed by a preliminary

injunction, preventing Harvard from subjecting Mr. Doe to disciplinary proceedings with regard

to the alleged sexual assault.  The Court should do this because Mr. Doe meets all four of the

requirements outlined above.  First, he is likely to succeed on the merits of both of the claims in

his Complaint—breach of contract and breach of the implied covenant of good faith and fair

dealing.  Second, he is likely to suffer irreparable harm in the absence of preliminary relief.

Third, the balance of harms overwhelmingly weighs in his favor.  And, finally, an injunction is in

the public interest.

### A.    Mr. Doe Is Likely to Succeed on the Merits of Both of His Claims.

Mr. Doe prevails on the first and most important of the temporary restraining order and

preliminary injunction factors—likelihood of success on the merits—with respect to both his

breach of contract claim and his breach of the implied covenant of good faith and fair dealing

claim.  First, Mr. Doe is likely to succeed on his breach of contract claim, because (a) he and the

University had a contract, which included the terms of Harvard's Policy and the express

jurisdictional limitations of that policy (thereby providing Mr. Doe an objectively reasonable

expectation that he would not be subjected to Harvard's campus disciplinary process under these

circumstances); and (b) FAS' actions clearly violate that Policy.[3]  And, second, Mr. Doe is likely

to succeed on his implied covenant of good faith and fair dealing claim for the same reasons.

---

[3] In breach of contract cases in which a disciplinary proceeding already has been concluded, and
the complaint alleges that the proceeding was conducted unfairly, courts also have considered
whether the proceeding was conducted with "basic fairness."  *See, e.g., Doe v. Trustees of
Boston College*, 892 F.3d 67, 87 (D. Mass. 2018) (summary judgment inappropriate on breach of
contract claims where evidence presented question of fact for jury on whether proceedings had
been conducted with "basic fairness"); *Doe v. Brandeis University*, 177 F. Supp. 3d 561, 594 (D.
Mass. 2016) (denying motion to dismiss where complaint alleged a proceeding that lacked "basic

1.      **Mr. Doe Is Likely to Succeed on His Claim for Breach of Contract.**

The elements of a breach of contract claim in Massachusetts are: (1) the existence of a

contract, (2) a breach of that contract, and (3) resultant damages to the suing party.  *See*

*Michelson v. Digital Fin. Servs.*, 167 F.3d 715, 721 (1st Cir. 1999).  Mr. Doe can establish all

three of these elements.  The Policy is a contract between Mr. Doe and Harvard; Harvard—

through FAS—is violating that Policy; and Mr. Doe has suffered, and will continue to suffer,

damages as a result.

a.      **The Policy Is a Contract Between Mr. Doe and Harvard.**

"It is well-established that the student-college relationship is contractual in nature."  *Doe*

*v. Brandeis*, 177 F. Supp. 3d at 593 (citing *Mangla v. Brown Univ.*, 135 F.3d 80, 83 (1st Cir.

1998)).

The Policy sets forth, at least in part, the terms of that contractual relationship.

"Brochures, *policy manuals*, and other advertisements can form the basis of . . . contractual

agreements," including agreements between universities and their students.  *Guckenberger v.*

*Boston Univ.*, 957 F. Supp. 306, 317 (D. Mass. 1997) (emphasis added); *see also Mangla*, 135

---

fairness" to the plaintiff).  Although FAS's decision to proceed with an investigation is, itself, unfair to Mr. Doe, and violates his contractual rights, Mr. Doe does not allege at this time that the content of the proceeding itself is fundamentally unfair as to him, because the proceeding against him has technically only just begun, and should continue no further.  If it were to continue further, the proceeding itself may present any number of separate fairness concerns that would also give rise to a breach of contract claim.  If that happens, Mr. Doe certainly will not be the first to have raised such concerns about Harvard's policies in this area.  *See Doe v. Brandeis*, 177 F. Supp. 3d 561, 573 (noting without deciding that "Harvard . . . appears to have substantially impaired, if not eliminated, an accused student's right to a fair and impartial process[.]"); Exhibit 10 (Elizabeth Bartholet et al., *Rethink Harvard's Sexual Harassment Policy*, Boston Globe (Oct. 15, 2014), https://www.bostonglobe.com/opinion/2014/10/14/rethink-harvard-sexual-harassment-policy/HFDDiZN7nU2UwuUuWMnqbM/story.html).

F.3d at 83 ("The student-college relationship is essentially contractual in nature. The terms of the contract may include statements provided in student manuals[.]").

And courts have specifically found that a university's policies governing investigation of sexual misconduct claims may be part of the student-university contract. For example, in *Schaer v. Brandeis University*, 735 N.E.2d 373 (Mass. 2000), the plaintiff, a male student at Brandeis who had been found responsible for sexually assaulting a female student, sued Brandeis for breach of contract based on alleged violations of a section in the university's handbook entitled "Rights and Responsibilities." The trial court dismissed this claim for failure to state a claim; the appellate court, however, reversed. *Id.* at 376. And, while the Massachusetts Supreme Court ultimately reversed again, it did so only after expressly concluding that a university's disregard of procedures promised in its handbook could give rise to a student's breach of contract claim. *Id.* at 378-80. And, in a more recent case, a Court in this District found that Brandeis University's sexual misconduct policies and procedures were part of the terms of its contract with its student (the plaintiff), *and* that Brandeis had breached those policies and procedures by subjecting the student to a disciplinary process that was unfair in several key respects. *Doe v. Brandeis*, 177 F. Supp. 3d at 570, 593-612.

**b.      Harvard—Through FAS—Is Breaching Its Own Policy, and Therefore Its Contract with Mr. Doe.**

In the student-university context, Massachusetts courts have held that "[a] breach of contract is established if the facts show that the [college] has 'failed to meet the [student's] reasonable expectations.'" *Walker v. Pres. and Fellows of Harvard College*, 840 F.3d 57, 61-62 (1st Cir. 2016) (quoting *Schaer*, 735 N.E.2d at 378). Here, Mr. Doe reasonably expected that Harvard would abide by its own jurisdictional limitations and would not subject him to its disciplinary process regarding alleged conduct that had no connection to Harvard.

Harvard does not dispute that its investigation into Ms. Roe's allegations against Mr. Doe exceeds the jurisdictional limits of the University's Policy.  Exhibit 4 and 5.  Its FAS nevertheless claims the authority to pursue an investigation based solely on FAS having authorized itself to do so, notwithstanding, and in contravention of, the University Policy. Exhibit 5.  In short, FAS baldly has informed Mr. Doe that the Policy does not prevent it from going beyond what the Policy allows.

Ironically, however, the FAS Policy and Procedures itself explicitly acknowledges that FAS in fact is bound by the University Policy—FAS is not free to do whatever it likes in subjecting its students to its disciplinary processes regarding claims of sexual misconduct.  More specifically, the FAS Policy and Procedures states that the University's Policy "applies to all Harvard Schools and units, *including the FAS*, and to all Harvard students, faculty, staff, appointees, and third parties."  Exhibit 2 at 3 (emphasis added).  And it explicitly purports to "adhere[] to the University Policy and Procedures"—but then is doing exactly the opposite in pursuing this investigation against Mr. Doe.  *Id.*  The University's website also holds out the FAS Policy and Procedures as procedures that implement the Policy, and therefore fall under the University's umbrella of authority.  Exhibit 6.

In other words, the publications of both the University and FAS—i.e., the materials on which a Harvard student reasonably could rely—indicates that FAS cannot deviate from the University's Policy when it comes to subjecting students to disciplinary processes regarding allegations of sexual assault.  This presents the same situation as in *Cloud v. Trustees of Boston University*, 720 F.2d 721 (1st Cir. 1983).  In that case, a Boston University law student was disciplined for peeping under the skirts of female students in the university library.  *Id.* at 723. The law student sued Boston University for breach of contract, among other claims, on the

grounds that the university had applied the wrong policy to his disciplinary proceedings.  He had

been disciplined under Boston University's general disciplinary policies.  He argued that,

because he was a law student, the law school policies—which he believed were more lenient

procedurally—should apply, not the university policies.  The First Circuit rejected that argument,

and affirmed the district court's grant of summary judgment on the breach of contract claim, for

three reasons.  First, the violations had occurred in the university's library, not on law school

property.  *Id.* at 724.  Second, the complaining students were university students from outside the

law school.  *Id.*  And, third, the law school's policies had clearly stated that its students "are

subject [to] *both* the rules of Boston University and to the rules and regulations of the School of

Law," and the plaintiff thus reasonably should have expected to be subject to the university's

umbrella policies.  *Id.* (emphasis added).  Mr. Doe is likely to succeed on his breach of contract

claim for the same reason Cloud failed.  Unlike Cloud, Mr. Doe can point to a University policy

that makes clear that it, not an individual school's policies, should govern, and he reasonably has

relied on that policy.  FAS has developed policies and procedures that exceed the jurisdictional

limits of the Policy.  This is a clear breach of Harvard's contract with Mr. Doe.

### c. Harvard's Breach Has Damaged, and Is Damaging, Mr. Doe.

For the reasons discussed in more detail below, Mr. Doe has suffered, and will suffer,

harm as a result of Harvard imposing its disciplinary processes on him.  He already has spent

substantial time and money, and it only has just begun.  He has had to study the policies and

procedures, as well as the scant evidence Ms. Roe has provided thus far, and he has had to have

numerous discussions with his counsel about the case.  All of this comes at the expense of his

schoolwork, on-campus job, and extracurricular activities.  And the process is only getting

started.  If he participates, he will have to be interviewed by ODR; he likely will need to provide

additional written statements; he will have to try to locate witnesses who are willing to be

interviewed by Harvard—since neither he nor Harvard has any power to compel them to be

interviewed—and he will have to review whatever report is issued at the conclusion of this

process.  All of this will cost substantial time and money—to say nothing of the incredible

anxiety and stress he is experiencing, and will continue to experience, faced with the possibility

that Harvard might (wrongfully) find him responsible and suspend or even expel him.

Mr. Doe already has paid an extraordinary amount of money to Harvard in tuition and

fees.  And he will lose incalculably more than that, financially and otherwise, if he is suspended

or expelled.  *See, e.g.*, *Doe v. Brandeis*, 177 F. Supp. 3d at 601 (discussing repercussions of

finding of responsibility for sexual misconduct for "[p]ost-graduate educational and employment

opportunities").

**2.     Mr. Doe Is Likely to Succeed on His Claim for Breach of the
Covenant of Good Faith and Fair Dealing.**

Mr. Doe also is likely to succeed on his claim against Harvard for breach of the covenant

of good faith and fair dealing, for two reasons.  First, Harvard has ignored its obligations under

the Policy.  Second, even absent the Policy, it is fundamentally unfair for Harvard to subject Mr.

Doe to its disciplinary processes under these circumstances.

**a.     Subjecting Mr. Doe to Harvard's Disciplinary Processes
Breaches the Covenant of Good Faith and Fair Dealing
Because Doing So Violates the Policy.**

Every contract imposes an implied covenant of good faith and fair dealing.  *Doe v.

Boston College*, 892 F.3d at 87.  When applied in the context of school disciplinary proceedings,

this covenant "creates an independent duty to provide basic fairness."  *Id.* (citing *Uno Rests., Inc.

v. Bos. Kenmore Realty Corp.*, 441 Mass. 376 (2004)).  Basic fairness includes an obligation by

both parties not to do "anything to destroy or injure the other party's right to receive the benefits

to which they are entitled under the contract." *Doe v. Amherst College*, 238 F. Supp. 3d 218, 220

(D. Mass. 2017) (citing *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 583 (1991)).

Harvard's Policy is crystal clear that FAS does not have the authority to put Mr. Doe

through this process.  Allowing FAS to do that in spite of the Policy is not only a violation of the

express terms of the contract, it is also a violation of the covenant of good faith and fair dealing.

> **b.      Subjecting Mr. Doe to Harvard's Disciplinary Processes
> Breaches the Covenant of Good Faith and Fair Dealing
> Because Doing So Violates Principles of Basic Fairness.**

Proceeding with the campus disciplinary process when it plainly is not within Harvard's

jurisdiction to do so would also violate Harvard's duties of basic fairness to Mr. Doe, and thus

the implied covenant of good faith and fair dealing.  Even if the disciplinary process vindicates

Mr. Doe—which it should—Harvard still will have railroaded him through a process that the

school had no jurisdiction to initiate in the first place.  That is patently unfair.  Although the

concept of basic fairness "is not well-defined, and no doubt varies with the magnitude of the

interests at stake, it is nonetheless clear that the university must provide its students with some

minimum level of fair play." *Doe v. Brandeis*, 177 F. Supp. 3d at 573.  And, as every first-year

law student learns, "fair play and substantial justice" are a standard part of a jurisdictional

analysis. *Int'l Shoe Co. v. State of Wash., Office of Unemployment Compensation and

Placement*, 326 U.S. 310, 316 (1945).  Jurisdiction must comport with due process—and, even

though Harvard is a private school, Massachusetts law has made clear that private schools have

contractual obligations of due process towards their students.  *See Doe v. Boston Coll.*, 892 F.3d

at 82-83 (noting Boston College's "contractual obligations for due process and fundamental

fairness"); *Doe v. Brandeis*, 177 F. Supp. 3d at 602-03 (finding student had adequately pled

breach of contract claim where school's disciplinary procedures failed to provide protections such that, in criminal context, accused would have been denied due process).

Imposing Harvard's disciplinary processes on Mr. Doe under these circumstances also would violate basic fairness because it would deprive Mr. Doe of his right to receive benefits to which he is entitled under his contract with Harvard—namely, a Harvard education, and all the opportunities it affords. Even if Mr. Doe is completely vindicated by this process, it will have substantially interfered with his academics and his searches for post-graduation employment. Mr. Doe, like most Harvard students, manages a heavy academic workload—and being subjected to a process such as this is extremely stressful and time-consuming. No matter the ultimate outcome of the proceeding, Mr. Doe would certainly suffer by continuing to be subjected to it.

### B.      Mr. Doe Will Suffer Irreparable Harm Without Injunctive Relief.

Mr. Doe undoubtedly will suffer irreparable harm if the Court does not grant injunctive relief—even if the Harvard disciplinary proceeding were to completely vindicate him on the merits.

First, as discussed above, Mr. Doe (in the midst of final exam preparations) will be subject to a process that is inherently stressful, and that will make it significantly more difficult to manage his academic workload. And if he has to disclose the proceeding to potential employers, it will affect his ability to find a job as well. *Doe v. Brandeis*, 177 F. Supp. 3d at 602 ("It is true that the consequences of a university sanction are not as severe as the consequences of a criminal conviction. Nevertheless, they bear some similarities, particularly in terms of reputational injury.").

There will be no undoing the damage this will cause. Mr. Doe does not come from a privileged background. His father is a farmer. He is one of six children. He stands to lose a

great deal from being railroaded through this proceeding, which Harvard has no jurisdiction to initiate in the first place.

Moreover, Harvard's proposed proceeding will deprive Mr. Doe of many of the procedural protections he otherwise would have in the ongoing civil litigation, in a forum that Ms. Roe herself chose.  At this time, the Court in that proceeding is deciding whether to grant a motion filed by Mr. Doe seeking to dismiss some of Ms. Roe's claims.  But even if that motion is granted, discovery will begin—and with that, Mr. Doe will have subpoena power and expansive access to discovery—including testimony from Ms. Roe and other witnesses.  He has not yet had to submit an answer or provide a deposition.  But when he does, he will do so with an opportunity to review and respond to Ms. Roe's claims in detail, including any evidence that she believes supports her claims.  He also will have the opportunity to cross-examine her and any witnesses she may provide.[4]  He will not have any of those things in Harvard's campus disciplinary proceedings.

---

[4] In fact, under earlier guidance from the U.S. Department of Education ("Department"), schools were instructed to deny students who are accused of sexual assault the right of cross-examination, or risk losing federal funding under Title IX.  *See* U.S. Dep't of Education, Dear Colleague Letter on Sexual Violence (April 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.  That guidance only recently has been rescinded, with the Department now publishing proposed new regulations that will guarantee accused students the right to cross-examine accusers.  *See* U.S. Dep't of Education, Letter Rescinding the Dear Colleague Letter on Sexual Violence dated April 4, 2011 and the Questions and Answers on Title IX and Sexual Violence, dated April 29, 2014 (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf; U.S. Dep't of Education, Notice of Proposed Rulemaking, Title IX of the Education Amendments of 1972 (Nov. 15, 2018), https://www2.ed.gov/about/offices/list/ocr/docs/title-ix-nprm.pdf.  Notwithstanding the Department's rescission of its old guidance, and its proposed new regulations, Harvard has informed Mr. Doe that it nonetheless still will not afford him the right of cross-examination in its campus discipline proceeding against him.But even if this rule is ultimately passed, it will not be in time for Mr. Doe to avail himself of its protections.

Nor will Mr. Doe have a meaningful opportunity to respond to Ms. Roe's allegations.  To this day, he has been provided only a purported summary of what she has told Harvard—yet Harvard will ask him to sit for an interview in which he will be expected to answer all of the questions the investigator asks him.  He will not have the ability to subpoena witnesses in his defense to respond to her allegations—and since there are no witnesses at Harvard, Harvard will have no ability to compel them to provide evidence.

### C.       The Balance of Harms Weighs in Mr. Doe's Favor.

Mr. Doe has detailed the reasons Harvard's proposed proceedings will harm him.  By contrast, an injunction will not injure Harvard, or anyone at Harvard, in any way.  Mr. Doe has no disciplinary record, nor has he ever been accused of sexual misconduct before Ms. Roe's accusations.  Compl. ¶ 31; Exhibit 3 at 5.  Ms. Roe is not a student at Harvard; there is no concern that Mr. Doe's presence on campus will cause her any harm.  These allegations involve an event that took place more than sixteen months ago, and Mr. Doe has given Harvard no reason to believe that he is a threat to anyone on campus.  Harvard has acknowledged as much— twice—in writing.  Compl. ¶¶ 31-32; Exhibits 4 and 5.  Weighted against everything Mr. Doe stands to lose, respectfully, the balance of harms is not close.  *See Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d 704, 712 (S.D. Ohio 2016) (granting preliminary injunction where there was no evidence university believed plaintiff presented harm to other students, and had even permitted plaintiff to remain on campus), *aff'd*, 872 F.3d 393 (6th Cir. 2017); *Doe v. Pennsylvania State U.*, 276 F. Supp. 3d 300, 315 (M.D. Pa. 2017) (balance of harms favored movant where "absence of immediate relief during the pendency of the litigation will work irreparable harm to his professional career and advancement").

**D.      An Injunction Is in the Public Interest.**

An injunction is in the public interest for two reasons.  First, Mr. Doe has pointed to a violation of Harvard's own policies—which govern the entire student body—by FAS, which is the largest division of Harvard, and also appears to be the only school at Harvard that has asserted the authority to investigate students for violations for which the University has denied it jurisdiction.  *See supra* at 8 n.2.  Mr. Doe will likely not be the last student to be affected by this erroneous and unjust application of Harvard's Policy.  That there are more students within FAS than any other school or subdivision of the University only underscores this.  *See* *https://www.fas.harvard.edu/pages/what-fas*.

Second, there is no evidence Mr. Doe presents any harm to anyone in the Harvard community.  He has no disciplinary record, nor have any Harvard students filed complaints against him.  Harvard has expressly acknowledged it does not believe he is a threat to impose a "hostile environment" on anyone in the Harvard community.  Exhibits 4 and 5; *see Doe v. Pennsylvania State U.*, 276 F. Supp. 3d 300, 316 (M.D. Pa. 2017) (due process concerns weighed in favor of granting motion for preliminary injunction); *cf. Doe v. Blake School*, 310 F. Supp. 969, 985 (D. Minn. 2018) (public interest factor did not clearly favor either party when four other students had brought sexual misconduct complaints against the plaintiff).

## V.      CONCLUSION

For all of the foregoing reasons, Mr. Doe respectfully requests that the Court grant (1) a temporary restraining order enjoining Harvard from proceeding with a campus disciplinary proceeding with respect to Ms. Roe's allegations against Mr. Doe; (2) a similar preliminary injunction upon notice and an opportunity for Harvard to respond; and (3) any other relief that the Court deems proper.

DATED:  November 28, 2018          /s/_____

Rebecca LeGrand, BBO #660437
LeGrand Law PLLC
1775 Eye Street NW, Suite 1150
Washington, DC 20006
T: (202) 587-5725
rebecca@legrandpllc.com

Justin Dillon (*pro hac vice* application forthcoming)
William Pittard (*pro hac vice* application forthcoming)
Amelia Schmidt (*pro hac vice* application forthcoming)
KaiserDillon PLLC
1099 Fourteenth Street NW, 8th Floor—West
Washington, DC 20005
T: (202) 640-2850
F: (202) 280-1034
jdillon@kaiserdillon.com
wpittard@kaiserdillon.com
aschmidt@kaiserdillon.com

*Attorneys for Plaintiff John Doe*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 28th day of November, 2018, I served the foregoing upon the following counsel for Harvard University via e-mail:

Daniel Cloherty
Victoria Steinberg
Todd & Weld LLP
One Federal Street
Boston, MA 02110
617-720-2626

Ellen Fels Berkman
University Attorney
Harvard University
1350 Massachusetts Avenue
The Richard A. and Susan F. Smith Campus Center, Suite 980
Cambridge, MA 02138
(617) 496-1108 (telephone)
(617) 495-5079 (facsimile)
ellen_berkman@harvard.edu

*Attorneys for Defendant Harvard University*

_____/s/_____
Rebecca LeGrand