**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

_____
                                        )
**JOHN DOE,**                           )
                                        )
    **Plaintiff,**    )
                                        )   **Case No. 18-CV-12462-IT**
**v.**                                  )
                                        )
**HARVARD UNIVERSITY,**                 )
                                        )
    **Defendant.**    )
_____)

## OPPOSITION OF DEFENDANT PRESIDENT AND FELLOWS OF HARVARD COLLEGE ("HARVARD UNIVERSITY") TO PLAINTIFF JOHN DOE'S MOTION FOR RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### Introduction

Defendant President and Fellows of Harvard College ("Harvard" or "Harvard University"), by and through its undersigned counsel, hereby submits this Memorandum of Law in Opposition to Plaintiff John Doe's Motion for Temporary Restraining Order and Preliminary Injunction.  As explained below, Plaintiff's Motion improperly seeks to enjoin Harvard's Office of Dispute Resolution ("ODR") from investigating a recent complaint relating to a sexual assault allegedly committed by Plaintiff at an off-campus location.  Although Plaintiff attempts to argue that the ODR investigation is somehow being conducted in violation of Harvard's existing policies, the undisputed evidence demonstrates conclusively that the investigation is being conducted *precisely in accordance with* the policy established by Harvard's Faculty of Arts and Sciences ("FAS") regarding sexual and gender-based harassment and sexual and gender-based misconduct.  For that reason, Plaintiff's Motion must be denied.

1

To be clear, Section III of the FAS Policy at issue here explains that Harvard's FAS has a "commitment to training [Harvard] students to be citizens and citizen leaders within a larger community beyond the borders of [the Harvard] campus."  Affidavit of Katherine O'Dair in Support of Defendant's Opposition to Plaintiff's Motion for Temporary Restraining Order and Injunction (filed herewith) ("O'Dair Aff.") at ¶ 14.  To that end, the FAS Policy states that "sexual and gender-based misconduct" by members of the Harvard community should not be tolerated even when that misconduct occurs far from the Harvard campus and outside of any Harvard-sponsored program or activity.  *Id*. Plaintiff—a current Harvard student who has recently been accused of committing a rape while off-campus—contends that the FAS cannot and should not investigate the merits of that claim.  That assertion is simply wrong, and is flatly inconsistent with the plain language of the FAS Policy that is applicable to Plaintiff in these circumstances.

As explained below, Plaintiff is unlikely to succeed on the merits of his claims for relief and cannot show that he would suffer any irreparable harm in the absence of an injunction.  Moreover, both the balance of harms and the public interest weigh heavily against the issuance of an injunction against Harvard here.  Accordingly, Plaintiff's Motion should be summarily denied.

## I
## FACTUAL BACKGROUND

### A.     The July 22-23, 2017 Alleged Sexual Assault

On or about July 22, 2017, Plaintiff John Doe, a student enrolled in a program overseen by Harvard University's Faculty of Arts and Sciences ("FAS"), allegedly met Jane Roe, a student from another university.  Complaint ¶¶ 14-18.  At the time, the two were not attending or participating in any Harvard-related program or activity and were

located in a city some distance from Cambridge, Massachusetts.  *Id.*  Ms. Roe contends

that, during the late evening or morning hours of July 22-23, 2017, Mr. Doe sexually

assaulted and raped her.  *Id.* ¶ 19.

**B.**     **Ms. Roe Files a Civil Lawsuit and a Harvard Investigation Commences.**

Ms. Roe subsequently filed a civil lawsuit against Mr. Doe.  *Id.* ¶ 21.  Thereafter,

on or about August 13, 2018, the Title IX Coordinator at Harvard contacted Harvard's

Office for Dispute Resolution ("ODR"), requesting that ODR conduct an initial review of

the allegations set forth in the civil complaint.  *See* Affidavit of Victoria L. Steinberg,

Esq. in Opposition to Plaintiff's Motion for Temporary Restraining Order and Injunction

(filed herewith) ("Steinberg Aff.") at ¶ 2 & Ex. A (August 13, 2018 email).   In making

that request, Harvard's Title IX Coordinator noted that "the reported misconduct occurred

off-campus, and Ms. [Roe] is not a member of the Harvard community.  As a result, it is

not clear whether the University Sexual and Gender-Based Harassment Policy [the

"University Policy"] would apply.  Thus we ask that ODR also review the matter under

the Sexual and Gender-Based Harassment Policy and Procedures for the Faculty of Arts

and Sciences [the "FAS Policy"]."  *Id.* ¶ 3.

**C.**     **Harvard's Sexual and Gender-Based Harassment Policy (the "University Policy") and the FAS Policy on Other Sexual and Gender Based Misconduct (the "FAS Policy").**

**1.**     **The "University Policy"**

Consistent with its obligations under Title IX of the Education Amendments of

1972, relevant section of the Violence Against Women Reauthorization Act, Title VII of

the Civil Rights Act of 1964, and Massachusetts laws that prohibit various forms of

discrimination, Harvard University has adopted a University-Wide Sexual and Gender-

Based Harassment Policy (the "University Policy").  *See* O'Dair Aff., ¶ 3 & Ex. A.

Among other provisions, the University Policy provides relevant definitions and lists

resources available to assist those who have experienced gender-based or sexual

harassment, including sexual violence.  *Id.*

In a provision labelled "Jurisdiction," the University Policy explains that it applies

to "sexual or gender-based harassment that is committed by students, faculty, staff,

Harvard appointees, or third parties, whenever the misconduct occurs: (1) on Harvard

property; or (2) off Harvard property, if (a) the conduct was in connection with a

University or University-recognized program or activity; or (b) the conduct may have the

effect of creating a hostile environment for a member of the University community."  *See*

*id.* ¶ 4.

Notably, the University Policy states clearly that "[i]t does not preclude

application or enforcement of other University or School policies."  *Id.* ¶ 5.

## 2. **The "FAS Policy"**

Harvard University's Faculty of Arts and Sciences ("FAS") is the largest division

of Harvard University.  *Id* ¶ 6.  FAS comprises Harvard College and the Harvard

Graduate School of Arts and Sciences, the Harvard School of Engineering and Applied

Sciences, and the Harvard's Division of Continuing Education.  *Id.* ¶ 7.  FAS also

encompasses certain academic resources, such as libraries and museums, as well as other

campus resources and athletics.  *Id*.

Consistent with the University Policy, FAS has adopted the FAS Sexual and

Gender-Based Harassment Policy and Procedures (the "FAS Policy"), which is

applicable to all students within FAS and made available to them through a wide variety

of media, including the Harvard College Handbook for Students (the "Handbook"), which is available to the general public online.  *See id.* ¶¶ 8-9.  A link to the FAS Policy is included in the Student Handbook under the heading "Standards of Conduct in the Harvard Community" under the subheading "Sexual Misconduct."  *Id.* ¶ 10.

The FAS Policy explains that Harvard has adopted the University Policy and that the University Policy "applies to all Harvard Schools and units, including the FAS."  *Id.* ¶ 11.  The FAS Policy further explains that "[w]hile the FAS adheres to the University Policy and Procedures, it is responsible for elaborating and supplementing them to suit our own needs and goals."  *Id.* ¶ 12.  By way of example, unlike the University Policy, the FAS Policy includes a collection of provisions addressing prohibited relationships between FAS Faculty members and students, as well as other provisions addressing relationships between individuals of different University status.  *Id.* at Ex. B at 8-9.

Section II of the FAS Policy adopts the University Policy and reproduces that University Policy in its entirety.  *Id.* ¶ 13.  Section III of the FAS Policy then expands upon the University Policy with provisions addressing "Other Sexual and Gender-Based Misconduct" that fall "outside the jurisdiction of the University Policy."  *Id.* ¶ 14.  That Section of the FAS Policy reads, in relevant part, as follows:

### III. OTHER SEXUAL AND GENDER-BASED MISCONDUCT

The University Policy defines sexual and gender-based harassment within the context of preventing discrimination within our community. The Faculty of Arts and Sciences, including the College and the Graduate School of Arts and Sciences, shares an additional commitment to training our students to be citizens and citizen leaders within a larger community beyond the borders of our campus. For this reason, it is the expectation of the Faculty of Arts and Sciences that all students, whether or not they are on campus or are currently enrolled in a degree program, will behave in a mature and responsible manner. Consistent with this principle, sexual and gender-based misconduct are not tolerated by the FAS even when, because they do not have the effect of creating a hostile environment for a

member of the University community, they fall outside the jurisdiction of the University Policy. Because sexual and gender-based misconduct are in direct opposition to our community values, cases involving such conduct may be referred by the relevant Administrative Board ("Ad Board") to the Harvard University Office for Sexual and Gender-Based Dispute Resolution ("ODR") for investigation in accordance with the University Procedures and the jurisdictional guidelines described in this Policy.

. . .

Sexual and gender-based misconduct, as defined by this FAS Policy, go beyond the University Policy to encompass behaviors that are in direct opposition to our educational and community values. That is, these behaviors constitute a failure to meet FAS's expectations of its students as citizens and citizen leaders within a larger community beyond the borders of our campus and therefore may be subject to discipline. These provisions indicate our commitment to expecting behavior consistent with our values in our interactions with members of our broader community, as well as in our nonacademic activities on campus.

The above provisions are necessary because there are instances when we must demonstrate – to the broader world as well as to our own community – that sexual and gender-based misconduct are not consistent with the values we expect all members of FAS to uphold. ODR will evaluate such allegations upon referral consistent with the guidelines provided by the FAS, and may consult with an Ad Board Liaison in the process. ODR retains the right to close a case if, among other reasons, it determines in its discretion that it cannot conduct a prompt, fair, and thorough investigation. FAS retains responsibility for investigating violations of other policies that may come to light during an ODR investigation.

*Id*.

### D.     The ODR Investigation Proceeds under the FAS Policy.

On August 26, 2018, an ODR investigator met with the Title IX Coordinator to discuss the Complaint.  *See* Steinberg Aff. ¶ 4 at Ex. B. Thereafter, on September 20, 2018, ODR held an initial review discussion with Ms. Roe regarding the subject of the Complaint.  *Id.* ¶ 5.  Four days later, on September 24, 2018, Ms. Roe informed ODR that she would participate in the Harvard investigation as a Complainant.  *Id.*

On October 24, 2018, the ODR investigator assigned to the matter contacted Mr. Doe in writing and provided him with additional information regarding the investigation.

*Id.* ¶ 6.  Among other items, the ODR investigator requested that Mr. Doe provide a written statement in response to the allegations in the Complaint.  *Id.* ¶ 7.

On November 1, 2018, counsel for Mr. Doe contacted the ODR investigator assigned to the matter and argued, among other things, that Harvard's investigation "cannot, and should not, proceed" against Mr. Doe, again suggesting that there was a jurisdictional limitation that prohibited Harvard's investigation.  *Id.* ¶ 8.  In her response the next day, the ODR investigator again explained that the matter was proceeding under Section III of the FAS Policy, *not* under the narrower University Policy.  *Id.* ¶ 9.  The ODR investigator explained that Section III of the FAS Policy states that sexual and gender based misconduct will not be tolerated by the FAS "*even when . . . they fall outside the jurisdiction of the University Policy.*"  *Id.*   Indeed, Section III explains clearly that "[b]ecause sexual and gender based misconduct are in direct opposition to our community values, cases involving such conduct may be referred by the relevant Administrative Board ("Ad Board") to the Harvard University Office for Sexual and Gender-Based Dispute Resolution ("ODR") for investigation in accordance with the University Procedures and the jurisdictional guidelines described in this Policy."  O'Dair Aff. ¶ 14.

On November 7, 2018, Mr. Doe submitted a written response to the allegations in the Complaint in which he asserted that his sexual activity with Ms. Roe was consensual. In that response, Mr. Doe reasserted his argument that Harvard could not investigate the matter because the incident "occurred off-campus and had no connection with a Harvard program or activity."  Steinberg Aff. ¶ 10 & Ex. D.   In a response on November 8, 2018,

the ODR investigator once again clarified that the matter was arising under Section III of the FAS Policy, *not* under the narrower University Policy. *Id.* ¶ 11 & Ex. E.

**E.    Mr. Doe Files This Lawsuit and Seeks a Temporary Restraining Order and a Preliminary Injunction Against Harvard.**

On November 28, 2018, Doe filed the instant lawsuit against Defendant President and Fellows of Harvard College ("Harvard"). In his Complaint, which is not verified, Doe asserts two separate causes of action against Harvard: a claim for breach of contract (Count I) and a claim for breach of the covenant of good faith and fair dealing (Count II). *See* Complaint ¶¶ 34-52.

In Count I, Doe alleges that Harvard has breached its contract with him "by subjecting [him] to a campus disciplinary process with respect to allegations as to which the university has no jurisdiction." *Id.* ¶ 39. Doe further alleges that Harvard has breached its contractual obligations by subjecting him to a "disciplinary process" that is "arbitrary, capricious, malicious and being conducted in bad faith." *Id.* ¶ 40. In Count II, Doe contends that Harvard has breached the covenant of good faith and fair dealing that is implied in every contract for similar reasons: by subjecting him to an "investigatory and adjudicative process" that is "arbitrary, capricious, malicious and being conducted in bad faith." *Id.* ¶ 48.

In the accompanying Motion for Temporary Restraining Order and Preliminary Injunction, Doe seeks to enjoin the ongoing ODR investigation into the alleged sexual assault of Ms. Roe. In his Memorandum of Law ("Mem.") in support of that Motion, Doe argues that because Harvard's ongoing ODR investigation into this matter is inconsistent with the "jurisdiction" provision contained in the University Policy, he is likely to succeed on the merits of his two legal claims against Harvard. *See* Mem. at 2-3,

10, 12-13, 16.  Essentially, Doe argues that, notwithstanding the plain language set forth

in the FAS Policy authorizing such investigations as well as the plain language in the

University Policy stating that it does not preclude the enforcement of other school

policies, Harvard's FAS somehow lacks the "jurisdiction" to investigate allegations that

one of its students sexually assaulted a non-Harvard student off-campus in a setting that

does not involve a Harvard-related program or activity.  *See* Mem., *passim.*  Doe further

contends (without providing any evidentiary support) that he will suffer irreparable harm

in the absence of injunctive relief, *id.* at 17-18, that the balance of harms weighs in his

favor, *id.* at 18, and that an injunction would serve the public interest.  *Id.* at 20.

## II
## STANDARD OF REVIEW

Preliminary injunctive relief "is an 'extraordinary and drastic remedy.'"  *Voice of*

*the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2001)

(quoting *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)).  In deciding whether to grant a

motion for a temporary restraining order or a preliminary injunction, this Court must

consider: (1) the moving party's likelihood of success on the merits, (2) whether the

moving party is likely to suffer irreparable harm in the absence of the requested

injunctive relief, (3) whether the balance of hardships weighs in favor of the moving

party, and (4) whether the issuance of the requested injunction is in the public interest.

*Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013).  The moving party's

likelihood of success on the merits is the "main bearing wall of this framework."  *W*

*Holding Co. v. AID Ins. Co.-Puerto Rico*, 748 F.3d 377, 383 (1st Cir. 2014) (quoting *ross-*

*Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996))(internal

quotations omitted).

**III**
**ARGUMENT**

**A.      Plaintiff Cannot Succeed on the Merits of his Claims for Relief.**

Plaintiff contends that he is likely to succeed on both his breach of contract claims
and his claim for breach of the covenant of good faith and fair dealing.   Plaintiff is
wrong on both counts.   As explained below, Plaintiff has grossly mischaracterized and
misinterpreted the Harvard policies concerning sexual misconduct committed by Harvard
students.   A simple review of those policies and the applicable facts here demonstrates
that Harvard has not breached *any* obligation it may have to the Plaintiff.

**1.      The Operative Contract Terms Arise Out of the FAS Policy Because**
**That Policy Governs the Investigation of Plaintiff.**

Plaintiff's Motion is based upon a false premise: that Harvard is conducting a
review of Plaintiff's alleged sexual misconduct pursuant to its University-Wide Sexual
and Gender-Based Harassment Policy (the "University Policy").   That University Policy
addresses "sexual or gender-based harassment that is committed by students, faculty,
staff, Harvard appointees, or third parties, whenever the misconduct occurs: (1) on
Harvard property; or (2) off Harvard property, if (a) the conduct was in connection with a
University or University-recognized program or activity; or (b) the conduct may have the
effect of creating a hostile environment for a member of the University community."   *See*
O'Dair Aff. ¶ 4.   Because his alleged misconduct occurred off-campus and was unrelated
to a University program and activity, and because the alleged victim is a non-Harvard
student, Plaintiff argues that the University Policy does not and cannot apply here and
that Harvard's supposed efforts to enforce that University Policy against him amounts to
a breach of contract.   *See* Mem. at 11-13.

But as Plaintiff well knows, Harvard's investigation of Plaintiff has *not* arisen under the University Policy, but instead has arisen under Section III of the FAS Policy governing "Other Sexual and Gender-Based Misconduct."  *See* Steinberg Aff. ¶¶ 6-11 & Exs. B-E (correspondence with Plaintiff and his representatives repeatedly explaining this distinction).  That FAS Policy explains that Harvard's FAS expects "that all students, *whether or not they are on campus or are currently enrolled in a degree program*, will behave in a mature and responsible manner."  *See* O'Dair Aff. ¶ 14 (emphasis added).  Thus, the FAS Policy makes crystal clear that sexual and gender based misconduct will not be tolerated by the FAS "*even when . . . they fall outside the jurisdiction of the University Policy*."  *Id*. (emphasis added).  The FAS Policy states that "[b]ecause sexual and gender based misconduct are in direct opposition to our community values, cases involving such conduct may be referred by the relevant Administrative Board ("Ad Board") to the Harvard University Office for Sexual and Gender-Based Dispute Resolution ("ODR") for investigation in accordance with the University Procedures and the jurisdictional guidelines described in this Policy."  *Id*.

The FAS Policy further explains that it is designed to address sexual and gender-based misconduct that "*go[es] beyond the University Policy to encompass behaviors that are in direct opposition to our educational and community values*.  That is, these behaviors constitute a failure to meet FAS's expectations of its students as citizens and citizen leaders within a larger community beyond the borders of our campus and therefore may be subject to discipline.  These provisions indicate our commitment to expecting behavior consistent with our values in our interactions with members of our broader community . . ."  *Id*.  (emphasis added).  Accordingly, by enacting this Policy,

FAS made crystal clear to its students that sexual and gender-based misconduct that was beyond the scope of the University Policy could still be subject to discipline.

The FAS Policy is part and parcel of the Harvard Student Handbook that is made available to all FAS Students as well as to the general public. *See* O'Dair Aff. ¶ 9 & Ex. C.[1] Thus, the FAS Policy regarding off campus sexual misconduct was part of the "express policies" provided to him as a Harvard student, and are therefore also part of the very same contract that Plaintiff contends has now been breached by Harvard. *Cloud v. Trustees of Boston University*, 720 F.2d 721, 724 (1st Cir. 1983) (holding that student may properly be subjected to both University-wide rules and school specific rules relating to student conduct and discipline).

Accordingly, Plaintiff's contention that his "reasonable expectations" are somehow delineated solely by the jurisdictional limitations set forth in the University Policy—without regard to the plain language of the FAS Policy—is specious. There is simply no basis for Mr. Doe to contend that he "reasonably expected that Harvard would abide by" the jurisdictional limitations set forth in the University Policy (*see* Mem. at 12) when Harvard is enforcing the wholly separate provisions of the FAS Policy. Thus, not only is Plaintiff unlikely to succeed on the merits of his breach of contract claim, that claim should be summarily dismissed.

**2.      The University Policy Does Not Restrict the FAS's Authority to Investigate Off-Campus Sexual Misconduct of FAS Students.**

Blithely disregarding the plain language of the FAS Policy—which expresses an unambiguous intent to address sexual and gender-based misconduct that falls beyond the

---

[1] *See* https://www.fas.harvard.edu/files/fas/files/fas_sexual_and_gender-based_harassment__policy__and__procedures-1-13-16.pdf.

narrower scope of the University Policy—Plaintiff instead appears to argue that the University Policy must be the *exclusive* policy addressing sexual misconduct by Harvard students, and that the language in the University Policy must operate to limit the ability of FAS to enact its own additional policies regarding off-campus student sexual and gender-based misconduct.  Indeed, Plaintiff repeatedly asserts that the jurisdictional language in the University Policy somehow *prohibits* FAS from separately enforcing additional standards for sexual or gender based misconduct upon its students in the broader community.  *Id.* at 4 (asserting that the University's policies "*bar* the university and its component entities from doing what FAS is attempting to do here") (emphasis added); 7 (referring to the "jurisdictional limitations imposed by the [University Policy]"); 12 (again referring to the "jurisdictional limitations" of the University Policy); 13 (suggesting that Harvard is acting "in contravention of" the University Policy); 16 ("Harvard's Policy is crystal clear that FAS *does not have the authority* to put Mr. Doe through this process.") (emphasis added).

But simply repeating this assertion over and over again does not make it so.  The jurisdictional limitations established by the University Policy, by their express terms, apply *only* to that very same University Policy.  *See* O'Dair Aff. ¶ 4.  *Nothing* in the University Policy prohibits any of Harvard schools from establishing and enforcing additional standards regarding the conduct of their students in the broader community. To the contrary, the University Policy expressly provides that "[*i*]*t does not preclude application or enforcement of other University or School policies*."  *See id.* ¶ 5 (emphasis added).  The FAS Policy echoes this very same point when it explains that the FAS "is responsible for elaborating on [the University Policy and Procedures] and *supplementing*

them to suit [FAS's] own needs and goals."). *Id.* ¶ 12. Accordingly, Plaintiff's contention that the University Policy somehow prevents FAS from holding its students to appropriate standards in connection with their interactions with the broader community beyond Harvard is baseless.

Moreover, there is nothing remotely improper about FAS's effort to hold its students to appropriate standards of conduct in arenas beyond those governed by the separate University Policy. Courts have routinely upheld universities' efforts to impose standards of conduct on their students in connection with their interactions with the wider community. *See, e.g., Doe v. The Ohio State University*, 136 F. Supp. 3d 854, 867 (S.D. Ohio 2016) (noting that "Courts that do analyze the issue usually find that universities may regulate the wholly off-campus activities of their students to the extent that regulation contributes to the universities' (usually broadly defined) mission."); *Hill v. Bd. of Trustees of Michigan State Univ.*, 182 F.Supp.2d 621, 627 n. 2 (W. D. Mich. 2001) ("Hill fails to cite any case holding that a university violates the Constitution by suspending a student for off-campus acts. This Court doubts such a case exists because universities typically take into consideration many off-campus acts in deciding whether to admit or retain a student."); *Gomes v. Univ. of Maine Sys.*, 304 F.Supp.2d 117, 126 (D. Me. 2004) ("The University's legitimate interest in punishing the student perpetrator of a sexual assault or protecting the student victim does not end at the territorial limits of its campus."). Here, Harvard's FAS has a legitimate interest in ensuring that its students do not engage in sexual and gender-based misconduct when they interact with the larger community beyond the borders of the Harvard campus, and there is nothing in the University Policy that prohibits FAS's decision to hold its students to such standards.

**3.** **There is No Allegation that the University Breached Any Term of the FAS Policy.**

Once it is clarified – as was repeatedly explained to Mr. Doe prior to his filing of this lawsuit, *see* Steinberg Aff. ¶¶ 6-11 – that Section III of the FAS Policy contains express terms authorizing the current investigation into his alleged conduct, it becomes equally clear that there has been no breach of any contractual obligation owed by Harvard to Mr. Doe. Indeed, an alleged rape of a non-Harvard student off-campus and not in the course of a Harvard-related program is *precisely* the type of sexual or gender based misconduct allegation that "fall[s] outside the jurisdiction of the University Policy," but which Section III of the FAS Policy *explicitly permits* the school to investigate. *See* O'Dair Aff. ¶ 14. Mr. Doe does not claim– because he cannot claim– that Harvard has breached its obligations to him under the FAS Policy. For this additional reason, his breach of contract claim has no merit.

**4.** **Doe is Unlikely to Succeed on His Claim for Breach of Covenant of Good Faith and Fair Dealing.**

Likewise, Doe fails to establish a likelihood of success on the merits of his claim for breach of the covenant of good faith and fair dealing. "The covenant may not . . . be invoked to create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance. Accordingly, '[t]he requirement of good faith performance is ... circumscribed by the obligations in the contract.'" *Doe v. W. New England Univ*., 228 F. Supp. 3d 154, 180–81 (D. Mass. 2017), citing *Speakman v. Allmerica Fin. Life Ins*., 367 F. Supp.2d 122, 132 (D. Mass. 2005). Unable to identify a breach of the obligations set forth in the applicable FAS Policy, Mr.

Doe cannot succeed on a claim concerning the "manner of performance" of those obligations. *Id.* (citing *Uno Rests., Inc. v. Bos. Kenmore Realty Corp.,* 441 Mass. 376 (2004)); *see also Eigerman v. Putnam Investments, Inc.*, 450 Mass. 281, 285-90 (2007) (affirming dismissal of complaint where unambiguous contract foreclosed plaintiff's claims for breach of contract and breach of the implied covenant of good faith and fair dealing).

**B.**    **Plaintiff Cannot Establish Any Irreparable Harm.**

Even if Plaintiff had a viable legal claim against Harvard (which he does not), his request for an injunction would fail due to his inability to establish any irreparable harm. A showing of irreparable harm that cannot be adequately remedied at law is of paramount importance to any claim for injunctive relief. *Sampson v. Murray*, 415 U.S. 61, 88 (1974) ("This Court has stated that '[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.'").

As an initial matter, Plaintiff has provided no cognizable evidence to support his claims of irreparable harm. The Complaint is not verified, and the Plaintiff has not submitted any affidavit testifying to any of the supposedly irreparable injuries he claims he will suffer.  For that reason alone, a preliminary injunction may not issue here. *See Sampson v. Murray*, 415 U.S. 61, 88-89 (1974); *see also Gov't Ctr. Camera, Inc. v. United States*, 1987 WL 28337, at *2 (D. Mass. Nov. 5, 1987).

Lack of cognizable evidence aside, however, the litany of supposed "harms" to which Plaintiff alludes in his Memorandum is legally insufficient to give rise to any injunctive relief.  First, Plaintiff makes broad and generalized claims that the "stress" created by the ODR investigation will inhibit his ability to manage his academic

workload and that "if he has to disclose the proceeding to potential employers" it will interfere with his job prospects. *See* Mem. at 17. But such claims cannot support issuance of an injunction. *See State of Connecticut v. Com. of Mass.*, 282 U.S. 660, 674 (1931) (explaining that an injunction "issues to prevent existing or presently threatened injuries. One will not be granted against something merely feared as liable to occur at some indefinite time in the future."). In fact, courts have specifically rejected this very type of alleged irreparable harm – supposed stress and anxiety over the course of an investigation and/or potential reputational damage – in other suits seeking preliminary relief enjoining universities from engaging in Title IX investigations. *See Doe v. Univ. of Chicago*, 2017 WL 818859, *5 (N.D. Ill. Mar. 2, 2017) (rejecting plaintiff's claim that, because the disciplinary process threatened his educational opportunities and his reputation, he would suffer irreparable harm, where the school had only recently begun its investigation and thus the harm was speculative and the tribunal "might very well clear [plaintiff] of any wrongdoing"); *Jackson v. Macalester College*, 169 F.Supp.3d 918, 922 (D. Minn. 2016) (finding no irreparable harm where school's investigation had just begun, plaintiff had not yet been interviewed, and thus his assertion that there is a "high likelihood" he would be found responsible and expelled was wholly speculative); *The Ohio State Univ.*, 136 F.Supp.3d at 870 (rejecting plaintiff's assertion that he would suffer irreparable injury by undergoing "humiliation, extreme anxiety, mental distress, and damage to his reputation").

Plaintiff's other assertions of "harm" similarly fail to establish this element of his claim. He states that he "stands to lose a great deal from being railroaded through this proceeding," Mem. at 17-18, but he fails to state what precisely he will "lose," let alone

any valid basis for the contention that he is being "railroaded."  Plaintiff's other

suggestion—that he somehow will be irreparably harmed because the University's

investigation will deprive him of the "procedural protections" he would otherwise enjoy

in the civil case brought by Ms. Roe (Mem. at 18)—makes no sense.  As a party in the

pending civil case against Ms. Roe, Plaintiff is fully entitled to avail himself of whatever

procedural protections and discovery opportunities that may be available to him in that

separate proceeding.  Nothing in the pending ODR investigation would in any way

interfere with those procedural rights.[2]

### C.      The Balance of Hardships Does Not Favor Mr. Doe.

Plaintiff's abject failure to articulate any cognizable harm that he might suffer if

the ODR investigation proceeds further demonstrates that the balancing of harms in this

instance necessarily favors Harvard and weighs heavily against the issuance of any

injunction.

While Plaintiff asserts that "an injunction will not injure Harvard, or anyone at

Harvard, in any way," Mem. at 19, that conclusory comment ignores the potential impact

that an injunction could have on Harvard's disciplinary system.  Harvard has an obvious

interest in maintaining the integrity of that system, *see Nokes v. Miami Univ.*, 2017 WL

3674910, at *14 (S.D. Ohio Aug. 25, 2017), and it has a clear interest in maintaining the

safety of its campus and regulating the activities of its student body.  *Cf. Doe v. Univ. of

Michigan*, 325 F. Supp. 3d 821, 829 (E.D. Mich. 2018) (acknowledging "the University's

---

[2]Notably, Plaintiff himself acknowledges that he is *not* challenging the adequacy of the investigative procedures that ODR will employ in connection with its investigation at this time.  *See* Mem. at 10-11 n.3 ("Mr. Doe does not allege at this time that the content of the proceeding itself is fundamentally unfair as to him, because the proceeding against him has technically just begun.").  Plaintiff's concession here serves to highlight that his claims of harm are little more than speculation at this point.

strong interest" in campus safety and addressing sexual misconduct allegations). Issuance of an injunction against Harvard here "would cast doubt on [it]s power to regulate its student body, including investigating and disciplining its students for sexual misconduct." *The Ohio State Univ.*, 136 F. Supp. 3d at 871.  This could undermine the process with respect to other investigations which may be ongoing or received in the future, and may also dissuade other victims of sexual assault from reporting to Harvard, leaving the Harvard community vulnerable and less safe.  *Id.*; *see also Doe v. Pennsylvania State Univ.*, 276 F. Supp. 3d 300, 315 (M.D. Pa. 2017) ("generally agree[ing]" with the proposition that an injunction would "lead to students seeking injunctive relief each time they are unhappy with the outcome of their disciplinary proceeding, and that sound policy concerns caution against that result.").

With no countervailing harm to weigh against these concerns, there is little doubt that this factor weighs against entry of a preliminary injunction against Harvard.

**D.      Issuance of an Injunction would not serve the Public Interest.**

Finally, issuance of an injunction against Harvard in this case would not serve the public interest here.  In support of his "public interest" argument, Plaintiff returns to his misreading of the relationship between FAS Policy and the narrower University Policy, claiming that he is one of many students who may be affected "by this erroneous and unjust application of Harvard's Policy."  Mem. at 20.  For the same reasons stated above, *see supra* pp. 10-15, this argument is devoid of merit.

Indeed, nothing about the application of Section III of the FAS Policy here has been "erroneous" or "unjust."  To the contrary, FAS's expressed desire to ensure that its students do not engage in sexual and gender-based misconduct when they interact with

the larger community is wholly consistent with the public interest.  *See, e.g., Doe v. George Washington University,* 305 F. Supp. 3d 126, 136 (D.D.C. 2018) (recognizing that there is a "strong public interest" reflected in a university "being able to independently investigate and, when appropriate, discipline its students for misconduct"); *Tsuruta v. Augustana Univ.*, 2015 WL 5838602, *10 (D.S.D., Oct. 7, 2015) ("There is some public interest, however in universities . . . adhering to the policies and procedures that they are required by law to adopt in order to adjudicate complaints of sexual assault among students.").  Accordingly, any injunction preventing Harvard from holding its students to that entirely reasonable standard when those students range beyond the borders of the Harvard campus would be improper.

## <u>CONCLUSION</u>

For all the foregoing reasons, Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction should be denied.

Respectfully submitted,

*/s/ Daniel J. Cloherty*
Daniel J. Cloherty, BBO #565772
dcloherty@toddweld.com
Victoria L. Steinberg, BBO #666482
vsteinberg@toddweld.com
Alycia Kennedy, BBO #688801
akennedy@toddweld.com
TODD & WELD LLP
One Federal Street
Boston, MA 02110
Telephone:    (617) 720-2626
Facsimile:    (617) 227-5777

*Attorneys for Defendant President and
Fellows of Harvard College*

Dated:  December 6, 2018

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as nonregistered participants on December 6, 2018.

*/s/ Daniel J. Cloherty*
Daniel J. Cloherty